OPINION
Defendants PSL, Inc., Randy P. Perrotti, Donald Latore, Joseph Sbrocco and Courtesy Auto Mall, Inc. appeal a judgment of the Court of Common Pleas of Richland County, Ohio. Plaintiff Theodore F. Schluter and Whitey's, Inc. of Shelby cross-appeal the judgment. Appellants assign two errors to the trial court:
ASSIGNMENTS OF ERROR
ASSIGNMENT OF ERROR NO. 1
 THE TRIAL COURT ERRED IN GRANTING PLAINTIFF SCHLUTER'S MOTION FOR A DIRECTED VERDICT.
ASSIGNMENT OF ERROR NO. 2
 THE TRIAL COURT ERRED IN REMITTING THE ENTIRE AMOUNT OF THE DAMAGE AWARD ATTRIBUTABLE TO ATTORNEY FEES WHICH WERE INCURRED TO NEGOTIATE NEW PURCHASE AND MANAGEMENT AGREEMENTS.
Cross-appellants assigns eight errors to the trial court:
ASSIGNMENTS OF ERROR
 I. THE TRIAL COURT ERRED BY GRANTING SUMMARY JUDGMENT AND DISMISSING PLAINTIFFS' CLAIMS FOR BREACH AND SPECIFIC PERFORMANCE OF THE CONTRACT TO PURCHASE.
 II. THE TRIAL COURT ERRED BY GRANTING PARTIAL SUMMARY JUDGMENT AGAINST PLAINTIFFS UPON DEFENDANTS' COUNTERCLAIM FOR BREACH OF THE MANAGEMENT CONTRACT.
 III. THE TRIAL COURT ERRED BY INSTRUCTING THE JURY THAT PLAINTIFFS HAD BREACHED THE MANAGEMENT CONTRACT WITH DEFENDANTS AS A MATTER OF LAW.
 IV. THE TRIAL COURT ERRED BY FAILING TO APPLY THE DOCTRINE OF ELECTION OF REMEDIES TO DEFENDANTS' COUNTERCLAIM AGAINST PLAINTIFFS FOR BREACH OF THE MANAGEMENT AND PURCHASE CONTRACTS.
 V. THE TRIAL COURT ERRED BY FAILING TO GRANT PLAINTIFFS' MOTION FOR A DIRECTED VERDICT DISMISSING DEFENDANTS' COUNTERCLAIM FOR BREACH OF THE MANAGEMENT AND PURCHASE CONTRACTS.
 VI. THE TRIAL COURT ERRED BY REFUSING TO INSTRUCT THE JURY UPON THE ISSUE OF MITIGATION OF DAMAGES.
 VII. THE TRIAL COURT ERRED BY FAILING TO GRANT A REMITTITUR AND SET ASIDE THE ENTIRE AMOUNT OF THE JURY'S DAMAGE AWARD.
 VIII. THE TRIAL COURT ERRED BY DENYING PLAINTIFFS' MOTION FOR A NEW TRIAL AND/OR JUDGMENT NOTWITHSTANDING THE VERDICT.
Cross appellants' statement pursuant to Loc. App. R. 4(D) asserts that in the portion of the trial court's judgment entered summarily in favor of appellants, the trial court erred both as a matter of law in construing the contract between the parties, and also, there existed genuine issues of material fact which should have been submitted to the jury.
This action arose out of a contract for sale of an automobile dealership in Shelby, Ohio. Defendant Perrotti was the manager of the dealership and owner of the parcel of property on which it was located. Perrotti was also a minority shareholder in the corporation which owned the dealership franchise and assets, PSL Motors, Inc. The majority shareholders and principal financial backers of PSL was Latore and Sbrocco. Latore and Sbrocco had a variety of business ventures, including the dealership operated as "Perrotti-Chrysler-Dodge-Jeep-Eagle-Plymouth". PSL, under Perrotti's management and with the financial backing of Latore and Sbrocco operated the dealership from 1989 until the sale in 1995.
During the time Perrotti managed the dealership, he had contact with plaintiff Theodore Schluter who was principal owner of a competing Chrysler dealership in the nearby town of Mansfield, Ohio. There was evidence presented it is customary in the automobile industry for dealers to trade automotive parts and to extend each other credit for the purchase of those parts. Contrary to industry standards, when Perrotti's dealership needed to purchase automotive parts from Schluter's dealership, Schluter allegedly refused to extend any credit. Schluter allegedly informed Perrotti that Schulter felt there were too many Chrysler dealerships in the area, and he did not intend to help his competition. Perrotti alleged Schluter indicated he intended to put Perrotti's dealership out of business.
Perrotti's dealership was not a success, and during the years it operated, Latore and Sbrocco spend hundreds of thousands of dollars in an effort to keep the dealership afloat. In 1995, Latore and Sbrocco decided the dealership was a losing proposition, and determined to put it up for sale. Shortly thereafter, Schulter contacted Perrotti about the availability of the dealership. Perrotti referred to Schulter to Latore and Sbrocco. Schulter formed Whitey's, Inc. of Shelby, of which he was a principal shareholder, for the purpose of purchasing and operating the Shelby dealership.
Latore, Sbrocco and Schluter engaged in a series of meetings designed to accomplish the sale of the dealership. Latore and Sbrocco advised Schulter that the dealership's agreement with Chrysler required the dealership be managed by a qualified individual or entity. For this reason, the parties negotiated for Schluter to manage the dealership in the interim period between the time the agreement to sell was reached and the time when the sale was approved by Chrysler and the transition fully accomplished. The parties executed a written purchase agreement for the dealership on November 1, 1995. The purchase agreement provided for a base purchase price for the dealership's non-vehicle assets of $400,000, with a down payment placed in escrow of $100,000. Most of the Perrotti dealership's cash, receivables, payables, indebtedness, and liabilities were specifically excluded from the sale, but the purchase agreement provided that the buyer would assume the secured indebtedness upon certain new vehicles, which could be returned without obligation to Chrysler if the vehicles were not sold. The buyer also assumed the remaining obligations on certain of PSL's equipment leases. The buyer had the option, but not the obligation, to purchase any of the used cars presently on the lot. Schluter and Whitey's did not exercise that option.
Schluter inspected the dealership and spoke with Perrotti about the used car inventory. Perrotti alleges he informed Schluter the dealership had taken certain used cars in trade-ins, but had not been able to discharge the liens against those cars because of the dealership's cash-flow problems. Section 9, (C) of the purchase agreement provided that the seller was responsible to satisfy, and provide proof of satisfaction of all liens arising out of the operation of PSL at the closing. Section 1 (F) (IV) of the purchase agreement provided the creditors were to be paid out of the purchase price at closing, and listed the order of priorities in paying creditors.
On November 3, 1995, the parties entered into a management agreement, which provided Schulter and Whitey's, Inc. would commence management of the dealership on November 6, 1995. Schulter estimated he believed it would take between 60 and 90 days for Chrysler to approve the sale and close the transaction after the parties came to their agreements.
The management agreement provided that the manager would have sole and exclusive authority to manage and operate the business and should provide all working capital necessary for the operation of the business, including the new vehicle floor plan financing for the vehicles acquired after the commencement date. Whitey's was obligated to complete any work in process but did not have to pay interest, taxes, insurance, or carrying charges on any vehicles which it had declined to purchase under the purchase agreement. PSL had sole responsibility for liquidating the vehicles, and in compensation for its services, Whitey's would received 100 percent of the aggregate of net profits and losses from the operation of the business taken as a whole for the term of the contract. If Whitey's sold any new cars for PSL, PSL would be reimbursed at the factory invoice price less any adjustments for PSL's cost. Parts and accessories sold from PSL's inventory would be reimbursed at cost.
Section 7 of the management agreement provided that if any of the terms of the management agreement conflicted with or was inconsistent with terms of the purchase agreement, the terms of the purchase agreement should prevail.
Schluter deposited $100,000 into an escrow account to be applied towards to the purchase price at closing.
Schulter went to the dealership on November 6, 1995, to begin performance on the management agreement. Schulter retained some of PSL's existing employees and took with him some members of the staff from his Mansfield operation. There were still a large number of new and used vehicles on the dealership lot which had not been included in the assets purchased. Whitey's was not obligated to sell these vehicles. Perrotti was not generally present during the transition of the management of the dealership, although Perrotti had taken some of the vehicles to auction. During this transitional time, many of PSL's unsecured creditors were calling the dealership with concerns about their accounts payable because the creditors learned of the sale of the dealership.
Schulter maintained he did not learn until November 6, 1995, that a number of the vehicles on the lot were trade-ins which still had the pre-existing security interest liens on them from the original purchases. Schulter felt PSL had expressly or impliedly represented to the customer, and the lender for the new car being purchased, that some of the purchase money would be used to pay off the pre-existing lien on the trade-in. PSL had instead used the loan proceeds towards its purchase of the new car. Schulter began receiving calls from customers, who had been contacted by the secured lenders of the trade-ins, because the payment on the old vehicle was late.
Schulter believed PSL's actions in not discharging liens on the trade-ins, but rather, using the money against the price of the new vehicles, constituted illegal bank fraud. He alleges he discovered after November 6, that some of the transactions were well over thirty days old, and the customers were understandably very upset. Schulter maintains he did not want to appear to be a party to an illegal or fraudulent practice, and immediately contacted PSL and demanded that all the unpaid pre-existing liens on traded-in vehicles be paid off immediately. Latore indicated he would take care of the matter. At trial, evidence was presented the total amount of the unpaid trade-in liens was approximately $43,000.00. Latore tendered a check in the amount of $25,000.00 on November 8, 1995. However, Schluter left the dealership on November 8, and did not return to manage the property. On November 21, 1995, Latore, Sbrocco, Schluter and their counsel all met at the dealership to discuss the breakdown of the management contract. Schulter reiterated his demand all unpaid liens be discharged before he would return to manage the dealership, maintaining he was unwilling to assume any potential liability for PSL's prior practices. In response, PSL produced canceled checks in support of its claim it had discharged all the liens, and further offered to indemnify Schulter against any future claims arising out of PSL's prior irregular financing practices.
Thereafter, the parties continued to negotiate in an attempt to get Schulter to resume management of the dealership. Schulter asked that all PSL's creditors be paid in full, that he be given access to PSL's bank account, and that PSL remove all vehicles Schulter would not buy from the dealership property. Schuler made all these demand conditions precedent to his return to resume his management duties, although none of the demands were consistent with the agreements the parties had entered into previously.
Latore and Sbrocco agreed to meet all the new demands on condition Schulter immediately resumed management of the dealership. However, Schluter set forth more conditions before he would agree to resume management of the dealership. At this point, Latore and Sbrocco decided Schulter did not intend to manage the dealership as required by the purchase agreement, and they set out to find a new buyer for their dealership. As rationale for this action, Latore and Sbrocco asserted Schulter was well aware that the Chrysler Corporation had the right to terminate the dealer franchise if there was no qualified manager on site.
On November 28, Schluter gave notice even though the management agreement had broken down, he was willing to go forward with the purchase of the dealership. However, on January 10, 1996, PSL entered into a purchase agreement with Courtesy Auto Mall, Inc.
Schulter and Whitey's, Inc. of Shelby brought suit against PSL, Courtesy Auto Mall, and PSL's principals for breach of contract. Defendant appellees counterclaimed, denying they had breached the agreement to sell, and asserting Schulter and Whitey's had breached both the purchase agreement and the management agreement. Appellee further alleged Schulter's actions indicated he had never intended to perform on the agreement, but rather, Schulter engaged in all the activities in order to put his chief competitor out of business. Appellees' counterclaim included a count for fraud.
The matter proceeded in the common pleas court, and the trial court granted summary judgment against Schulter and Whitey on all their claims against all the defendants. The case proceeded to trial on the counterclaims, but at the close of the defendant's case, the trial court granted a directed verdict on the fraud claim. The counterclaim on the breach of contract was submitted to the jury, which returned a verdict on behalf of defendants on their counterclaim in amount of $62,580.65. This verdict represents $34,000.00 in consequential damages, and $28,580.65 for attorney fees incurred in arranging the new purchase and management contracts with Courtesy Auto Mall. The trial court later sustained plaintiff's motion for remitter with respect to the $28,528.65 attorney fees, but overruled the motion with regard to the $34,000.00 consequential damages. Both parties appealed the trial court's various judgments.
We will address PSL's appeal first.
 I
PSL first argues the trial court erred in directing a verdict on the fraud count against Schulter.
Civ. R. 50 provides in pertinent part:
 When a motion for directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct the verdict by the moving party.
When considering a motion for directed verdict, the trial court does not weigh evidence or consider the credibility of the witnesses, but rather, reviews the sufficiency of the evidence as a matter of law, Ruta v. Breckenridge-Remy Company (1982), 69 Ohio St.2d 66. The test is whether, construing the evidence most strongly in favor of the non-moving party, reasonable minds could come to differing conclusions upon the evidence presented, seeGrau v. Kleinschmidt (1987), 31 Ohio St.3d 84. On appeal, because the issue is a question of law, not a question of fact, this court conducts a de novo review of the evidence, see Keetonv. Telemedia Company of Southern Ohio (1994), 98 Ohio App.3d 405.
In an ordinary action at law for money owing based on fraud, a preponderance of the evidence is sufficient to prove fraud,Household Finance Corp. v. Aultenberg (1966), 5 Ohio St.2d 190. Evidence necessary to sustain a finding of fraud as the basis for equitable recession or reformation of a written agreement, on the other hand, must be clear and convincing, see e.g., Morris v.Investment Life Insurance Company (1969), 18 Ohio App.2d 211.
In order to maintain an action for fraud, the following evidence must be established:
 1.) An actual or implied misrepresentation or concealment of a matter of fact which relates to the present or past, and which is material to the transaction;
 2.) Knowledge of falsity or such utter disregard and recklessness toward the truth or falsity of the representation that knowledge may be inferred;
 3.) Intent to mislead another into relying on the representation;
4.) Actual, justified reliance on the representation;
 5.) Injury proximately caused by the reliance, Freidland v. Lipman (1980), 68 Ohio App.2d 255.
Stated simply, PSL asserts Schulter, at the time he entered into the contract, had no intention of performing his obligation, but rather, induced PSL to enter into the agreement with the intent of destroying their business.
PSL correctly asserts it is often difficult to present direct evidence of fraudulent intent, and actual fraud is usually inferred from circumstantial evidence. We note the trial court incorrectly found PSL had to present clear and convincing evidence of fraud. The correct standard is preponderance of the evidence. Nevertheless, because we conduct a de novo review, this error is not necessarily fatal.
PSL asserts the evidence, and the reasonable inferences to be drawn from the evidence, would allow reasonable minds to find all the elements of fraud by a preponderance of the evidence. PSL notes Schulter had refused to extend credit to PSL, because PSL was his competitor whom Schulter wished to put out of business. PSL maintain Schulter entered into the agreement, and then almost immediately breached the agreement by demanding concessions outside the contract. PSL also notes Schulter knew without a qualified manager, Chrysler Corporation could terminate its association with the dealership, and the dealership would fail.
It appears nevertheless, that Schulter took certain steps to discharge his obligations under the contract, including depositing $100,000 into the escrow account against the purchase, and immediately going, with his employees, to the dealership to assume his management duties. Further, the reason Schulter advances for his initial reluctance to continue to performing, namely, that there was a possibility he would be involving himself in illegal bank fraud, is certainly a legitimate concern.
We have reviewed the record, and we find, construing the evidence most favorably in favor of PSL, PSL's evidence of fraud in the inducement is insufficient as a matter of law. For this reason, we conclude the trial court correctly directed a verdict on that issue, and removed the matter from the jury's consideration.
The first assignment of error is overruled.
 II
Next, PSL urges the trial court erred in remitting the damage award, because the jury found the attorney fees which were incurred to negotiate new purchase and management agreements were directly and proximately caused by Schulter's breach of the contract between them.
PSL maintains that because of Schulter's breach of the agreement, they were required to incur legal expenses associated with negotiating, drafting, and executing the second purchase and management agreement, and had Schulter performed under the original agreements, none of the expenses associated with the new agreements would have been necessary.
A motion for remittitur is subject to the discretion of the trial court, and this court may not substitute its judgment from that of the trial court unless it finds the court abused its discretion. The Supreme Court has frequently defined the term abuse of discretion as implying ". . . the court's attitude is unreasonable, arbitrary or unconscionable . . ." Steiner v. Custer
(1940), 137 Ohio St. 448.
The contract for sale of the dealership provided that seller and buyer would enter into a management agreement to operate the business pending the closing of the transaction. The clear intent of the parties, moreover, was not only to enter into the management agreement, but to perform under the management agreement in order to preserve the value of the asset which was the subject of the purchase agreement, namely the dealership. We conclude management of the property was indeed a condition precedent to the sale. For this reason, we conclude the trial court inappropriately sustained the motion for remitter. We further find the jury's determination that Schulter's breach of contract directly and proximately caused PSL to incur the attorney fees as damages is supported by the evidence presented at trial.
At oral argument, PSL conceded the amount of the attorney fees should be $14,860.65.
The second assignment of error is sustained.
We turn now to the cross-appellant's arguments.
 I and II
Cross-appellant's first two assignments of error challenge the trial court's summary judgment on the complaint for breach of contract and specific performance of the contract to purchase.
Civ. R. 56 (C) states in pertinent part:
 Summary judgment shall be rendered forthwith if the pleading, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from such evidence or stipulation and only therefrom, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence or stipulation construed most strongly in his favor. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.
A trial court should not enter summary judgment if it appears a material fact is genuinely disputed, nor if, construing the allegations most favorably towards the non-moving party, reasonable minds could draw different conclusions from undisputed facts, Hounshell v. American States Insurance Company (1981),67 Ohio St.2d 427 at 433. A trial court should not resolve ambiguities in the evidence presented, Inland Refuse TransferCompany v. Browning-Ferris Industries of Ohio, Inc. (1984),15 Ohio St.3d 121. A reviewing court reviews a summary judgment by the same standard as the trial court, Smiddy v. The Wedding Party,Inc. (1987), 30 Ohio St.3d 35.
The trial court found reasonable minds could only find that Schulter and Whitey's had breached the management agreement by abandoning the dealership on November 8, 1995, and continuing to refuse to return in spite of PSL's numerous concessions. The court also found as a matter of law that the breach of the management agreement excused PSL's obligation to complete the sale of the dealership to Schulter and Whitey's.
Schluter argues the management agreement was clearly intended solely as an inducement, to Whitey's and Schulter to enter into the purchase agreement, and neither agreement contained any language whatsoever which obligated them to manage the dealership. Cross-appellants argue the purchase agreement only required the parties to execute the management agreements, which the parties did. As cross-appellants correctly assert, a trial court should not look beyond the terms of an unambiguous contract to ascertain the intent of the parties, Aultman Hospital Association v.Community Mutual Insurance Company (1989) 46 Ohio St.3d 51.
We find, consistent with our findings in II, supra, that performance of the management agreement was a condition precedent to PSL's obligation to sell the dealership, and that Schulter and Whitey's breach of the management agreement excused PSL from performing on the purchase agreement.
We further find the trial court correctly determined reasonable minds could not differ on the issue of whether Schulter and Whitey's had breached the management agreement by abandoning the dealership only a few days after beginning to perform, and thereafter, demanding and receiving further concessions contrary to the executed agreement, while still refusing to perform.
The first and second assignments of error are overruled.
 III
Next, Schluter argues the trial court erred instructing the jury that he had breached the management contract with PSL as a matter of law. For the reasons stated supra, we find the jury instructions were correct.
The third assignment of error is overruled.
 IV
Next, Schluter argues the trial court should have applied the doctrine of election of remedies to the PSL's counterclaim against him for breach of the management and purchase contracts. Because we find throughout that performance of the management agreement was a condition precedent to the purchase agreement, we find cross-appellees were not required to elect between the remedies of recision and restitution or damages for breach of contract. Thus, it is inaccurate to say that PSL rescinded the contract, because in fact, Schulter and Whitey's failured to perform the management agreement and terminated the purchase agreement.
The fourth assignment of error is overruled.
 V
Cross-appellants urge the trial court erred by failing to grant their motion for a directed verdict dismissing the counterclaim. Because we find supra, there was sufficient evidence for the jury to render a verdict in favor of cross-appellees, we overrule this assignment of error.
 VI
Next, Schluter argues the jury should have been instructed on the issue of mitigation damages. Schluter argues PSL never demonstrated why it could not have hired a temporary manager after the breakdown of the management agreement, or even shut down the business entirely until the sale was closed.
The trial court requested all parties submit proposed jury instructions prior to the onset of trial. Schluter did not submit any instructions regarding mitigation, nor did he object to the trial court's jury instructions. After the jury had been charged, Schluter then requested instructions on mitigation, and the court refused.
We find the trial court did not err in refusing to instruct the jury on the issue of mitigation of damages. Accordingly, the sixth assignment of error is overruled.
 VII
Schluter next argues the trial court should have granted a remitter on the entire verdict, not just the attorney fees. As we noted supra, motions for remitter are addressed to the sound discretion of the trial court, and should not be disturbed on appeal absent an abuse of discretion. Our review of the record leads us to conclude the trial court did not abuse its discretion in refusing to remit the entire verdict. Accordingly, the seventh assignment of error is overruled.
 VIII
Finally, Schluter argues the trial court should have sustained his motion for a new trial and/or judgment notwithstanding the verdict for the reasons cited in his cross-assignments of errors I through VIII. Because we reject those arguments, supra, we find the trial court did not err in overruling cross-appellants' motions.
The eighth assignment of error is overruled.
For the foregoing reasons, the judgment of the Court of Common Pleas of Richland County, Ohio, is affirmed in part and reversed in part, and pursuant to Ohio App. R. 12, we enter final judgment on behalf of defendant-appellants/cross-appellees on their counterclaim in the amount of $48,860.65, representing consequential damages of $34,000 and attorney fees of $14,860.65.
By Gwin, J., Reader, P.J., concur.
Hoffman, J., concurs in part; Dissents in part.